**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
James M. Treglio (SBN 228077)
Isabel Rose Masanque (SBN 292676)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiff, on behalf of himself and all others similarly situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS MCPHEE, on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>BIG BRAND TIRE & SERVICE, a Utah Corporation; MS AMERICAN TIRE DEPOT, a California Corporation; and AP AMERICAN TIRE DEPOT, a California Corporation; and DOES 1-100, inclusive<br><br>Defendants. | CASE NO. 3:26-cv-02232-RS<br><br>**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**<br><br>  **(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**<br>  **(2) WIRETAP ACT, 18 U.S.C. § 2510 *et seq*.**<br>  **(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**<br>  **(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**<br>  **(5) CAL. BUS. & PROF. CODE §17200, ET SEQ. (CALIFORNIA UNFAIR COMPETITION LAW)**<br><br>**DEMAND FOR JURY TRIAL** |

Class Representative Plaintiff Chris McPhee ("Plaintiff"), by and through his attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1. Defendants BIG BRAND TIRE & SERVICE, a Utah Corporation; MS AMERICAN TIRE DEPOT, a California Corporation; and AP AMERICAN TIRE DEPOT, a California Corporation ("Defendants") owns and operates a website, https://www.americantiredepot.com  (the "Website" or "American Tire Depot").

2. When users visit the Website, Defendant causes tracking code, pixels, cookies, tags, scripts, local-storage objects, session-storage objects, and other software developed by third-party advertising, analytics, session-recording, customer-relationship-management, chat, and tag-management companies, including Meta/Facebook, Google, HubSpot, Crazy Egg, AdRoll, Cloudflare, StackAdapt, Bidr.io, Microsoft, Olark, and related vendors (collectively, the "Trackers"), to load and execute in Website visitors' internet browsers. These Trackers are deployed before Website visitors provide affirmative, advance consent and cause visitors' browsers and devices to transmit communications, contents, addressing information, device identifiers, browser identifiers, location-related information, and behavioral data to Defendant and third parties.

3. Because the Trackers intercept the contents of Website visitors' communications with the Website in real time, including the exact pages viewed, URLs and page titles requested, product and service pages viewed, search and filtering activity, clicks, scrolls, cursor movements, form interactions, chat-widget interactions, store-location activity, and other substantive signals that reveal the meaning and purpose of the visitor's communications with the Website. The intercepted communications are not limited to generic device metadata; they reveal the visitor's tire, wheel, vehicle-service, location, purchasing, and appointment-related interests, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

4. Because the Trackers also record, decode, and capture routing, addressing, and signaling information transmitted by Website visitors' browsers and devices, including IP

1

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

addresses, user-agent strings, browser and device characteristics, referrer URLs, page URLs, cookie identifiers, local-storage identifiers, session-storage identifiers, Facebook browser identifiers, Google client identifiers, HubSpot visitor identifiers, Crazy Egg visitor/session identifiers, geolocation-related data, store-location identifiers, and device/browser fingerprints, the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendants violated CIPA section 638.51(a).

5.      Plaintiff brings this action to stop Defendant from further invading the privacy rights of Website visitors and to recover statutory, compensatory, restitutionary, injunctive, and equitable relief for Defendant's violations of CIPA, the ECPA, CDAFA, the California Constitution, and the UCL.

**PARTIES**

6.      Plaintiff Chris McPhee resides in Oakland, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

7.      Defendant BIG BRAND TIRE & SERVICE, is a Utah Corporation with a principal place of business located in Moorpark, Utah.

8.      Defendant MS AMERICAN TIRE DEPOT, is a California Corporation with a principal place of business located in Bellflower, California.

9.      Defendant AP AMERICAN TIRE DEPOT, a California Corporation with a principal place of business located in Pomona, California.

**VENUE AND JURISDICTION**

10.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claim. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a putative class action in which the proposed class contains more than 100 members, at least one class member is a citizen of a state different from Defendant, and the amount in controversy exceeds $5,000,000 in the

2

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

aggregate. Venue is proper because Plaintiff accessed the Website from California, Defendant obtained Plaintiff's communications and data from California, and Defendant directed the challenged conduct toward California consumers.

**I. INTRODUCTION**

**A. The California Invasion of Privacy Act**

1.      The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

2.      Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3.      Individuals may bring an action against the violator of any provision of CIPA— including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

4.      The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statute aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity

3

of personal information are maintained in an age of modern communications and information storage." *Id.*

5.      Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

6.      The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

## II. DEFENDANTS ILLEGALLY INTERCEPT THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION

### A. Overview of Website Tracking Technology

7.      Website tracking technology originally consisted of simple tools such as first-party cookies accessible only by the domain (website address) that set the cookies. However, as online advertising and analytics advanced, the industry increasingly relied on third party cookies which are set and accessed by domains other than the website a user originally visited. Over time, websites began implementing techniques which enabled the sharing of data collected by first-party cookies with third party domains, giving them access to user activity.

8.      In addition to first-party and third-party cookies, the technology has further evolved into an advanced and interconnected system of methods that are capable of tracking the behavior of users across multiple websites, devices, and sessions using tools such as pixels, device "fingerprinting," and other real-time data exchanges.

#### i.   Cookies

9.      A cookie is a small text string with data created by a website's server and transmitted to a web browser, which then stores the string on the user's device. When the user revisits the website, the browser sends the string along with the HTTP request, allowing the tracker to

4

recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

10. When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

11. Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

### ii. Pixels

12. Pixel "events" are JavaScript tracking codes that send detailed information about user actions to third-party servers, such as Facebook and Google, in real-time.

13. Common user events tracked by Pixels include page views (when a user loads a specific webpage), content views (when a user interacts with a specific piece of content on a webpage), clicks (when a user selects a specific element on a webpage), form submissions (text or data a user inputs into a field on a webpage), and search queries (terms or phrases a user enters into a search box on a webpage).

14. Importantly, Pixel events represent a coordinated surveillance arrangement between websites and tech giants, like Facebook. A website lets Facebook watch their customers, and Facebook provides free tracking and analytics in exchange for data. Both profit from the arrangement at the expensive of consumer privacy.

### iii. Device fingerprinting

15. Device fingerprinting refers to a broad category of techniques that are used to identify a user's device across visits (also called "sessions"). It works by collecting information about a user's hardware and software attributes, such as browser type, operating system, screen resolution, installed fonts, and time zone and language settings. The combination of these attributes becomes the user's "device fingerprint."

5

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

16. When combined, the probability that two users have identical attributes and settings is very low, even if they have the same type of device or browser. This is because the technical characteristics still vary based on individual configuration and software versions, which allow trackers to accurately and uniquely identify users without relying on cookies.

17. Canvas fingerprinting is a specific type of device fingerprinting that identifies and tracks a user's device based on these unique characteristics. It works by downloading a Javascript code when a user visits a webpage and runs it in the user's browser. This initiates a process completely invisible to a user.

18. The Javascript creates an invisible HTML canvas element—like a digital drawing board—and draws texts, shapes, and emojis on the canvas using various fonts and colors. The script then reads back the exact pixel values of what it just drew and runs these pixels through a mathematical function (a "hash") that converts them into a "unique identifier." This unique identifier becomes the user's "device fingerprint."

19. The Javascript sends this fingerprint to a server, and the server uses it to recognize a user on future visits, without the use of any cookies.

20. The reason this process creates a unique identifier is because devices render graphics slightly differently based on their graphics card model, driver version, installed fonts, operating systems, screen resolution, and color calibration. These tiny variations create a unique pattern—like a fingerprint—that is remarkably stable and hard to change. This fingerprint persists even if a user clears their browser data.

### iv. IP Addresses

21. IP addresses serve an important functional role on the internet by acting like a digital postal address that allows devices to send and receive data.

22. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

6

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

23. Functionally, to make a website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant website data is stored.

24. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

25. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

26. Thus, the IP address enables a device to communicate with another device, such as a computer's browser communicating with a server.

27. However, IP addresses can also be used as potential user identifiers, especially when used in combination with additional data collected from the techniques described above.

28. Through an IP address, the specific device's state, city, and zip code can be determined.

29. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."

30. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code" and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests." Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service" because "[c]ompanies can use an IP address … to personally identify individuals."

31. For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis. Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising." "By targeting specific households or

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."

32.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy." "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."

33.    Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

34.    They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

35.    By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

36.    For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

37.    For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

**B. Tracking Technology on Defendant's Website**

38.    Using a combination of the tracking technologies described above, Defendant actively shared user data with multiple third parties by deploying code, tags, scripts, pixels, cookies, and other processes developed by Meta/Facebook, Google, HubSpot, Crazy Egg, AdRoll, StackAdapt, Bidr.io, Cloudflare, Microsoft, Olark, and other third-party vendors on the Website.

39.    Specifically, forensic testing confirmed that the Website deployed 103 third-party trackers, including 26 cookies, and 6 different canvas fingerprints. Defendants further shared data collected by these trackers with six major advertising networks.

8

40.     During the relevant period, the Website deployed at least dozens of third-party tracking requests, more than two dozen cookies, multiple local-storage and session-storage entries, multiple canvas-fingerprinting processes, Facebook/Meta tracking events, Google advertising and analytics requests, HubSpot tracking processes, Crazy Egg tracking processes, and third-party scripts that transmitted user communications and identifiers outside the Website.

### *i. Google Tracking Technology*

41.     Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level. Defendant embedded Google advertising, Google Analytics, Google Tag Manager, Google DoubleClick, and related Google code on the Website to collect, process, and transmit user activity and identifiers for analytics, advertising attribution, conversion measurement, audience creation, retargeting, and marketing optimization.

42.     Defendant's Google-related Trackers collected and transmitted detailed information about Website users, including IP address, user-agent information, browser and operating-system information, screen resolution, language settings, page URL, page title, referrer, timestamps, Google client identifiers, advertising identifiers, product-page views, and Website interaction data.

43.     The Google Ads, Google DoubleClick, Google Analytics, and Google Tag Manager enabled Defendant and Google to associate Website activity with persistent identifiers and to use that activity for advertising, analytics, attribution, audience building, conversion measurement, and retargeting. These communications revealed substantive details about what Plaintiff and other users sought to view, compare, locate, and purchase on the Website.

44.     Defendant also used Google-related scripts to initiate browser and device fingerprinting activity, including canvas-related data collection. These scripts caused users' browsers to disclose rendering characteristics, device/browser characteristics, and persistent identifiers capable of recognizing the same user or device across sessions.

45.     Finally, when a Website visitor was logged into a Google account or otherwise associated with Google identifiers, Google could link the Website data received through the

9

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

Trackers with Google's broader advertising and analytics ecosystem, including demographic, interest, and cross-site activity profiles.

### ii. Meta/Facebook Pixel Tracking Technology

46.     Facebook is a social media platform and social networking service that also offers an advertising and analytics tool called Meta Pixel. The Meta Pixel is a snippet of code integrated into a website that enables businesses to "measure, optimize, and build audiences" for their ad campaigns by tracking user actions and behavior.[1] Once installed, the pixel is activated as soon as a user visits a website.[2] Defendant embedded Meta/Facebook code on the Website to measure Website activity, optimize advertising, build audiences, retarget Website visitors, and transmit Website-event data to Meta/Facebook.

47.     Defendant's Meta/Facebook Trackers collected and transmitted information including page-view events, page URLs, page titles, referrers, timestamps, IP addresses, user-agent information, screen dimensions, browser identifiers, Facebook browser identifiers, pixel identifiers, and device/browser characteristics.

48.     Defendant's Meta/Facebook Trackers also collected Website users' page views, time on site, viewed content, product interests, store-location-related activity, and other behavioral signals reflecting the substance and meaning of users' Website communications.

49.     Meta/Facebook combined Website data received from Defendant's Trackers with Meta/Facebook's broader network of tracking data across websites, applications, accounts, devices, and advertising tools, enabling cross-site profiling, targeted advertising, retargeting, and audience creation.

50.     Facebook explains: "Once matched, we can tally [user] actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."

---

[1] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel; https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[2] *Id.*

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

51. Defendant implemented canvas-fingerprinting and browser-fingerprinting functionality through third-party scripts, including scripts associated with Google Tag Manager, Meta/Facebook, and HubSpot. These scripts caused Website visitors' browsers to render fonts, shapes, and geometry, read back canvas data, extract data URLs, and transmit the resulting characteristics to create persistent device or browser fingerprints.

52. Defendant also deployed Crazy Egg tracking code on the Website. Crazy Egg code records and analyzes user behavior, including clicks, scrolling, cursor activity, page interactions, heatmap activity, and session-level behavior. These communications reveal how a user moved through and interacted with the Website, not merely that the user connected to the Website.

53. Defendant deployed HubSpot tracking code and HubSpot visitor identifiers on the Website. HubSpot code collects and transmits visitor tokens, session data, page activity, referrers, timestamps, browser information, and other identifiers used for customer-relationship management, marketing automation, lead tracking, and behavioral analytics.

54. Defendant deployed advertising and retargeting code associated with AdRoll, StackAdapt, Bidr.io, Google Ads/DoubleClick, and Meta/Facebook. These Trackers collected Website activity and identifiers to enable cross-site advertising, conversion tracking, retargeting, and behavioral profiling.

55. Defendant deployed cookies and browser-storage entries that persisted beyond a single page load or session, including identifiers associated with Google, Meta/Facebook, HubSpot, Crazy Egg, Olark, geolocation or store-location functionality, device recognition, and session correlation. These objects were written to Plaintiff's browser and device and were used to recognize, track, and correlate Plaintiff's activity across Website visits and across third-party systems.

56. Defendant's Website caused Plaintiff's browser to make direct requests to third-party servers. Those requests transmitted the contents and meaning of Plaintiff's Website communications, as well as routing, addressing, and signaling information, while Plaintiff was communicating with the Website and before Plaintiff provided affirmative, advance consent.

57. Defendant did not provide Plaintiff with a pre-collection pop-up, checkbox, consent banner, or other mechanism that gave Plaintiff a meaningful opportunity to prevent the Trackers

11

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

from loading, executing, writing data to his browser, reading data from his browser, or transmitting his communications and identifiers to third parties before those events occurred.

58.     Defendant's privacy disclosures did not clearly disclose, before the Trackers loaded, that Defendant would cause third-party advertising, analytics, fingerprinting, session-recording, chat, and customer-relationship-management code to execute in Plaintiff's browser; read and write identifiers on Plaintiff's device; collect product, service, location, and session activity; and transmit the data to third parties for cross-site advertising, retargeting, analytics, and profiling.

### iii. Canvas Fingerprinting

59.     Defendants implement extensive canvas fingerprinting on the Website across multiple third-party services, deploying 6 separate scripts from Google, Facebook, HubSpot. By integrating 6separate fingerprinting instances across multiple vendors, this creates a highly unique and persistent identifier that can track users across sessions and websites.

**C. Defendants Aided and Abetted Third-Party Interception by Installing and Using Trackers on the Website to Collect Plaintiff's and Class Member's Communications Without Consent or Court Order**

60.     Section 631 of CIPA prohibits the interception of communications without the consent of all parties and provides that a person who aids, agrees with, employs, or conspires with another person to intercept communications may be liable. Cal. Penal Code § 631(a).

61.     In the internet context, a third party acts as an unauthorized interceptor when a website embeds tracking technology that captures user communications in real time and permits the third party to use the intercepted communications for its own commercial purposes. See *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169 at *4 (N.D. Cal. Apr. 4, 2025)(rejecting the argument that the trackers were not unauthorized third parties but "extensions" of the website); *Ambriz v. Google, LLC*, 2025 WL 830450 (third party trackers who have the capability to use the information transmitted are unauthorized parties regardless of their intent).

62.     Defendants own and operate the Website, https://www.americantiredepot.com, which offers tires, wheels, store-location tools, service-related information, promotions, and related products and services.

12

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

63.     Defendant intentionally incorporated the Trackers into the Website's source code, tag-management configuration, advertising configuration, analytics configuration, customer-relationship-management configuration, session-recording configuration, and related Website functionality. Defendant did so before and during Plaintiff's visits to the Website.

64.     As outlined above, when Plaintiff and other users visited the Website, Defendant's Website code caused the Trackers to load and execute in their browsers. Scripts and pixels do not execute on a visitor's browser unless the website operator places or calls that code through the website. Defendant therefore caused the Trackers to execute in Plaintiff's browser.

65.     Defendant configured, enabled, and benefited from the Trackers' collection and transmission of user communications and data. Defendant's use of the Trackers caused Plaintiff's browser to transmit Website communications, contents, identifiers, addressing information, device information, location-related information, and behavioral data to third parties in real time.

66.     The third-party operators of the Trackers used the collected information for their own commercial purposes, including advertising, retargeting, audience creation, cross-site identification, analytics, customer-relationship management, conversion measurement, platform improvement, and behavioral profiling.

67.     At no time before the Trackers loaded, executed, collected, read, wrote, or transmitted data from Plaintiff's browser did Defendant obtain Plaintiff's prior consent for the installation or use of the Trackers, the interception of his communications, the use of browser-storage identifiers, the creation of device or browser fingerprints, or the disclosure of his communications and identifiers to third parties. Defendant did not obtain a court order to install or use the Trackers.

68.     Defendant programmed, configured, and/or allowed the Trackers to deploy immediately when a user landed on the Website. Defendant did not provide Plaintiff a meaningful pre-deployment choice to reject the Trackers before they executed. Therefore, Defendants failed to obtain consent from Plaintiff and the Class Members prior to installing and using the Trackers on the Website, in violation of CIPA Sections 631 and 638.51.

13

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

69.    Under the ECPA, the consent of one party is also insufficient where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); see also, *Doe v. Meta Platforms, Inc.* (N.D. Cal. 2023) 690 F. Supp. 3d 1064, 1077.

70.    Because Defendant's interception, use, and disclosure of Plaintiff's communications and data also violated CIPA, CDAFA, the California Constitution, and the UCL. Defendant therefore cannot avoid ECPA liability by relying on its own participation in the communications, discussed *infra*, consent by United alone is insufficient to shield it from liability under the ECPA. See *Smith v. Rack Room Shoes, Inc.*, *supra,* 2025 WL 1085169 at *5 (the website tracking allegations are analogous to the purpose of engaging in a HIPPA violation, which courts consistently find constitutes an independent prohibited purpose.").

**D. Defendant's Conduct Constitutes an Unauthorized Interception of the Contents of Communications under CIPA and the ECPA**

71.    Because the Trackers intercepted Plaintiff's and Class Members' electronic communications with the Website, including the URLs requested, page titles viewed, product and service pages viewed, search and filtering activity, store-location activity, clicking, scrolling, cursor movement, chat-widget activity, form activity, and other behavioral signals that conveyed the substance, purpose, and meaning of their Website communications, Defendant's use of the Trackers constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

72.    Defendant's use of the Trackers also constitutes an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA. Defendant caused third-party code to read, attempt to read, learn, and transmit the contents or meaning of Plaintiff's messages, reports, or communications while those communications were being sent from, received at, or passing through Plaintiff's browser, the Website, and third-party tracking servers.

73.    "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of a communication." *In re Zynga Priv. Litig*. (9th Cir. 2014)750 F.3d 1098,

14

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

1106–07)(internal quotations omitted). The contents intercepted here included Plaintiff's tire and wheel interests, service interests, viewed products, viewed locations, Website path, clicks, scrolling, page interactions, and other communications that revealed what Plaintiff was attempting to view, compare, locate, or purchase on the Website.

74.     The communications intercepted by the Trackers are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about the user's interests, preferences, and potential consumer behavior.

75.     The interception occurred in real time because Defendant's Website code caused Plaintiff's browser to send data to third-party tracking servers as Plaintiff loaded pages, viewed content, interacted with the Website, and communicated with Website functionality. The third parties received the data contemporaneously with Plaintiff's Website communications, not after a completed communication had been stored only by Defendant.

**E. Defendant's Conduct Constitutes an Illegal Pen Register and Trap and Trace Device Under CIPA**

76.     CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

77.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

78.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

79.     In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

15

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

80. The Trackers are "processes" because they are software-based sequences that identify users and devices, collect data, record or decode routing, addressing, and signaling information, correlate that data with persistent identifiers, and transmit it to Defendant and third parties.

81. The Trackers are also "devices" because they operate through Plaintiff's browser, computer, smartphone, and/or other internet-connected devices and cause those devices to perform tracking, storage, reading, transmission, and identification functions.

82. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

83. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

84. The Website, Plaintiff's browser, Plaintiff's device, and the third-party tracking domains constituted instruments or facilities from which electronic communications were transmitted. Defendant's Trackers recorded, decoded, and captured addressing, routing, and signaling information transmitted by those instruments or facilities

85. Defendant installed and used the Trackers for marketing, analytics, advertising, retargeting, conversion measurement, customer-relationship management, session analysis, and Website-optimization purposes. The Trackers recorded, decoded, and captured routing, addressing, and signaling information, including Plaintiff's IP address, referrer, user-agent string, browser characteristics, operating-system characteristics, screen dimensions, language settings, page URL, cookie identifiers, local-storage identifiers, session-storage identifiers, Google client identifiers, Facebook browser identifiers, HubSpot visitor identifiers, Crazy Egg visitor/session identifiers, geolocation-related data, store-location identifiers, and device/browser fingerprints.

16

86. The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

87. The Trackers were not merely Defendant's ordinary server logs. Defendant caused Plaintiff's browser to initiate separate communications to third-party advertising, analytics, customer-relationship-management, session-recording, chat, and tag-management servers and caused those third parties to record, decode, and capture addressing and signaling information from Plaintiff's communications.

88. The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co.*, --- F. Supp. 3d --- 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

89. Defendant installed and used these processes without first obtaining Plaintiff's consent and without first obtaining a court order.

90. Because the Trackers recorded, decoded, and captured routing, addressing, and signaling information from Plaintiff's electronic communications, and because Defendant installed and used the Trackers without consent or a court order, Defendant violated CIPA section 638.51(a).

**F. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

91. Defendant's collection, use, interception, recording, decoding, fingerprinting, storage, and disclosure of Plaintiff's and Class Members' personally identifying information, nonanonymized identifiers, browser and device fingerprints, location-related information, Website activity, product and service interests, and session-level behavior constituted an invasion of privacy.

92. As alleged herein, the Trackers were designed to analyze Website data, measure and optimize advertising, conduct targeted advertising, create audiences, retarget visitors, profile users, improve marketing campaigns, and increase Defendant's revenue. Defendant accomplished these objectives through surreptitious, pre-consent collection and transmission of Plaintiff's and Class Members' communications and data.

### III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES

93. Plaintiff Chris McPhee visited the Website on multiple dates between April 2025 and October 2025 while located in California. Plaintiff used a browser on his personal device to

17

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

shop for, compare, and review tire, wheel, store location, and vehicle-service-related options for personal use.

94.    During his Website visits, Plaintiff viewed product and service pages and interacted with Website functionality by navigating pages, viewing tire and wheel options, reviewing location-related information, clicking links or buttons, scrolling pages, and communicating with Website features that revealed his tire, wheel, vehicle-service, location, and purchase-related interests.

95.    When Plaintiff visited the Website, Defendant's Website code caused the Trackers to load and execute in Plaintiff's browser. The Trackers wrote cookies and browser-storage entries, read browser and device characteristics, generated or accessed persistent identifiers, and caused Plaintiff's browser to transmit data to Defendant and third-party tracking servers.

96.    The communications and contents intercepted from Plaintiff included the URLs and page titles he requested, product and service pages he viewed, timestamps of his activity, referrer information, Website path, clicks, scrolling, cursor activity, page interactions, location-related activity, and other behavioral signals reflecting what Plaintiff sought to view, compare, locate, or purchase on the Website.

97.    Defendant also caused the Trackers to collect, record, decode, or capture Plaintiff's IP address, user-agent string, browser type and version, operating-system information, screen dimensions, language settings, referrer, cookie identifiers, local-storage identifiers, session-storage identifiers, Google identifiers, Facebook identifiers, HubSpot identifiers, Crazy Egg identifiers, geolocation-related data, store-location identifiers, and device/browser fingerprints.

98.    Defendant used the data collected from Plaintiff to analyze Website data, measure advertising and marketing campaigns, retarget Plaintiff and similar users, create or improve audiences, perform customer-relationship-management and analytics functions, and increase revenue for Defendant and advertising or analytics partners.

99.    The third parties that received Plaintiff's data were not passive conduits. They used the data for their own commercial purposes, including advertising, retargeting, analytics, user matching, audience creation, cross-site identification, customer-relationship management, conversion measurement, and behavioral profiling.

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

100.    Plaintiff did not provide prior consent for Defendant to install or use the Trackers on his browser, read from or write to his browser storage, create or access device/browser fingerprints, intercept his Website communications, collect his data, or transmit his communications and identifiers to third parties.

101.    Defendant did not obtain a court order before installing or using the Trackers.

102.    Defendant did not present Plaintiff with a pre-collection banner, checkbox, pop-up, or other meaningful choice that allowed Plaintiff to prevent the Trackers from loading and executing before they collected, read, wrote, or transmitted his data.

103.    Had Plaintiff known before using the Website that Defendant would cause third-party advertising, analytics, session-recording, customer-relationship-management, chat, fingerprinting, and tag-management code to execute in his browser and transmit his communications and identifiers to third parties, Plaintiff would not have used the Website in the same manner, would have used different privacy tools or browser settings, or would have avoided disclosing his Website communications and data.

104.    Thus, like Plaintiff, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

105.    Plaintiff seeks to access the Website without third-party tracking technologies intercepting, recording, decoding, collecting, disclosing, or using his communications, identifiers, and personal data, or, alternatively, to be provided with a meaningful pre-collection choice regarding what data is collected, stored, used, and disclosed.

106.    After learning that the Website caused third-party tracking code to execute in his browser, Plaintiff spent time and effort identifying and removing cookies, local-storage entries, session-storage entries, and other browser-stored identifiers associated with the Website; changing browser privacy settings; and attempting to prevent continued tracking and disclosure of his data.

107.    Plaintiff lost control over the dissemination, use, and commercial exploitation of his personal data, Website communications, location-related data, persistent identifiers, and device/browser fingerprint. Plaintiff's data has economic value because Defendant and the third-

19

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

party recipients used it for advertising, retargeting, analytics, conversion measurement, audience building, and other commercial purposes.

108. Defendant's Trackers consumed Plaintiff's device resources, including browser storage, processing resources, memory, bandwidth, and battery power, and altered Plaintiff's browser by writing cookies, local-storage data, session-storage data, and persistent identifiers without Plaintiff's prior consent.

## CLASS ACTION ALLEGATIONS

109. Class Representative Plaintiff brings this action on his own behalf and on behalf of all other persons similarly situated. The putative class that Plaintiff seeks to represent is composed of:

**Nationwide Class**

All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent two years prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").

**California subclass**

All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

110. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

20

111.    Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members can be ascertained through appropriate discovery, including records maintained by Defendant and third-party tracking vendors.

112.    There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the Defendants unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b)    Whether the Defendants unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c)    Whether Defendants violated CIPA section 631(a);

(d)    Whether Defendants violated CIPA section 638.51(a);

(e)    Whether Defendants violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(f)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(g)    Whether Defendants sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(h)    Whether Defendants sought or obtained a court order for its use of the Trackers; and

(i)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiff, like every other Class member, were exposed to virtually identical

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

conduct and are entitled to the same relief under the CIPA.

114.   Class Representative Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interest that is contrary to or in conflict with the interests of the Class he seeks to represent. Plaintiff has retained competent counsel experienced in privacy, consumer-protection, and class-action litigation and intends to prosecute this action vigorously.

115.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendants in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

116.   Proper and sufficient notice of this action may be provided to the Class members through direct mail.

117.   Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act,**

**Cal. Penal Code § 630, et seq.(a)**

**(California subclass only)**

118.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

119.   Plaintiff brings this claim individually and on behalf of the members of the proposed

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

Class against Defendant.

120. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

121. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

122. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

123. Defendant used the Trackers on the Website to intercept, read, learn, collect, use, and disclose information about Website visitors' behavior and activity on the Website, including Plaintiff's communications and data.

124. Defendant's Trackers intercepted the contents of Plaintiff's communications, including URLs and page titles requested, product and service pages viewed, search or filtering activity, store-location activity, clicks, scrolling, cursor activity, page interactions, chat-widget activity, form activity, and other substantive Website communications.

125. Defendant's Trackers intercepted Plaintiff's communications while they were being sent from or received by Plaintiff's browser, Defendant's Website, and third-party tracking servers.

23

The transmissions occurred contemporaneously with Plaintiff's Website activity.

126. The third-party recipients of Plaintiff's communications were separate entities that used the intercepted communications for their own commercial purposes, including advertising, retargeting, analytics, conversion measurement, audience creation, user matching, cross-site identification, customer-relationship management, and behavioral profiling.

127. Defendant aided, agreed with, employed, and/or assisted those third parties by embedding their code on the Website, configuring the Trackers to load on Website visits, enabling event transmissions, enabling cookies and browser-storage identifiers, enabling device/browser fingerprinting, and accepting analytics, advertising, retargeting, and marketing benefits from the resulting data collection.

128. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

129. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

130. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—IP addresses and device fingerprints—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

131. The Trackers recorded, decoded, or captured Plaintiff's IP address, user-agent string, browser characteristics, device characteristics, operating-system characteristics, screen dimensions, language settings, referrer, page URL, cookie identifiers, local-storage identifiers, session-storage identifiers, Google identifiers, Facebook identifiers, HubSpot identifiers, Crazy Egg identifiers, geolocation-related data, store-location identifiers, and device/browser fingerprints.

132. At all relevant times, Defendant installed and used the Trackers on Plaintiff's and Class Members' browsers and devices to collect, record, decode, capture, use, and disclose identifying information, addressing information, signaling information, and Website activity.

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

133.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

134.    Defendants did not obtain a court order to install or use the Trackers.

135.    Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 631(a) and 638.51(a), and each seeks and injunction and statutory damages of $5,000 for each of Defendant's violations of CIPA section 631(a) and 638.51(a).

### SECOND CAUSE OF ACTION

**Violation of the Wiretap Act**

**Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq*.)**

136.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

137.    The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

138.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

139.    "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

140.    "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

141.    Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

142.    Defendants are corporations and are therefore a "person" for purposes of § 2510(6).

143.    When Plaintiff and Class Members accessed the Website, Defendant violated 18 U.S.C. § 2511(1)(a) by intentionally causing the Trackers to load and execute in Plaintiff's and Class Members' browsers, where the Trackers intercepted the contents of electronic communications, including URLs, page titles, product and service pages viewed, search or filtering

25

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

activity, store-location activity, clicking, scrolling, cursor activity, page interactions, chat-widget activity, form activity, and other substantive Website communications, without prior consent.

144. When Plaintiff and Class Members accessed Defendant's website, efendant violated 18 U.S.C. § 2511(1)(c) by disclosing, or causing the disclosure of, Plaintiff's and Class Members' intercepted communications, contents, Website behavior, identifiers, location-related data, and device/browser data to third parties without prior consent.

145. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) by using Plaintiff's and Class Members' intercepted communications, contents, Website behavior, identifiers, location-related data, and device/browser data for advertising, retargeting, analytics, conversion measurement, audience creation, customer-relationship management, session analysis, marketing optimization, and revenue generation without prior consent..

146. Defendant's interception, disclosure, and use of Plaintiff's and Class Members' communications caused harm and injury, including invasion of privacy, loss of control over personal data and communications, loss of the economic value of personal data, unwanted profiling and retargeting, and time and effort spent attempting to remove or limit tracking identifiers and prevent further disclosure.

147. Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

**THIRD CAUSE OF ACTION**

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

**(California subclass only)**

148. The allegations of the preceding paragraphs are incorporated by reference as if fully

26

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

set forth herein.

149.    The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

150.    The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

151.    For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

152.    The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

153.    The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

154.    Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

155.    The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

156.   As discussed above, the information collected by the third party tracking technology outlined above constitute "data" within the meaning of the statute.

157.   Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

158.   The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

159.   The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

160.   Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

161.   Based on Defendant's unauthorized installation and storage of third-party tracking technology on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered, damaged, deleted, destroyed, or otherwise used Plaintiff's and Class Members' data, computers, computer systems, or computer networks in order to wrongfully control or obtain money, property, or data, in violation of Penal Code § 502(c)(1). Defendant did so by causing third-party scripts to execute in Plaintiff's browser, read browser and device characteristics, write cookies and browser-storage entries, access canvas-rendering data, create or access persistent identifiers, and transmit Plaintiff's data to Defendant and third parties for commercial use.

28

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

162. Similarly, Defendant violated Penal Code § 502(c)(4) by knowingly and without permission adding or altering data, computer software, or computer programs that resided or existed internal or external to Plaintiff's and Class Members' computers, computer systems, or computer networks. Defendant added and altered data by writing cookies, local-storage entries, session-storage entries, tracking identifiers, geolocation/store-location entries, analytics identifiers, advertising identifiers, and session identifiers to Plaintiff's browser and device.

163. Defendant violated Penal Code §§ 502(c)(6) and 502(c)(7) by knowingly and without permission providing and assisting in providing a means of accessing Plaintiff's and Class Members' computers, computer systems, and computer networks, and by accessing or causing those computers, computer systems, and computer networks to be accessed through the Trackers.

164. Further, Defendant violated Penal Code § 502(c)(2) by knowingly and without permission taking, copying, and making use of Plaintiff's and Class Members' data from their computers, computer systems, or computer networks, including IP addresses, browser and device identifiers, Website communications, Website behavior, device/browser fingerprints, location-related data, and persistent identifiers.

165. Plaintiff and Class Members are California citizens or residents who used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused access to Plaintiff's and Class Members' data, browsers, devices, computer systems, and computer networks while Plaintiff and Class Members were located in California.

166. Defendant was unjustly enriched by accessing, acquiring, taking, copying, and using Plaintiff's and Class Members' data and device resources without permission and using that data for advertising, retargeting, analytics, conversion measurement, audience creation, customer-relationship management, session analysis, marketing optimization, and revenue generation. Defendant's unjust enrichment will be determined at trial.

167. As a direct and proximate result of Defendant's CDAFA violations, Plaintiff and Class Members suffered damage and loss, including loss of control over their data, loss of the economic value of their data, diminution of privacy, unauthorized use of browser storage, consumption of processing resources, memory, bandwidth, and battery power, and time and effort

29

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

spent identifying, deleting, disabling, and mitigating cookies, local-storage entries, session-storage entries, persistent identifiers, and browser settings affected by Defendant's conduct. Under Penal Code § 502(e)(1), Plaintiff and Class Members are entitled to compensatory damages, injunctive relief, restitution, and other equitable relief in an amount to be determined at trial.

168.    Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## FOURTH CAUSE OF ACTION

### Invasion of Privacy

### (Violation of Art. 1, § 1, California Constitution)

### (California subclass only)

169.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

170.    "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

171.    The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

172.    Plaintiff and Class Members have a legally protected privacy interest in their electronic communications, Website activity, personal data, persistent identifiers, IP addresses, location-related data, device/browser fingerprints, product and service interests, store-location activity, chat or form interactions, and browser/device data collected, recorded, decoded, captured, used, and disclosed by Defendant and the Trackers.

173.    Plaintiff and Class Members had a reasonable expectation of privacy under the

30

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

circumstances. Website visitors do not reasonably expect that, before they provide affirmative consent, a tire and wheel retail website will cause third-party advertising, analytics, session-recording, customer-relationship-management, chat, tag-management, and fingerprinting code to execute in their browsers, read and write persistent identifiers, create device/browser fingerprints, record session-level behavior, collect location-related data, and transmit their substantive Website communications to third parties for cross-site advertising, retargeting, analytics, and profiling.

174.    Defendant's unauthorized installation and use of the Trackers, and Defendant's collection and disclosure to third parties of Plaintiff's and Class Members' communications, persistent identifiers, location-related data, device/browser fingerprints, and Website behavior without prior consent or adequate pre-collection notice, invaded Plaintiff's and Class Members' privacy.

175.    Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person because: (i) Defendant caused third-party code to execute in Plaintiff's browser before obtaining consent; (ii) Defendant transmitted Plaintiff's substantive Website communications and identifiers to third parties; (iii) Defendant enabled device/browser fingerprinting designed to identify Plaintiff even when cookies are blocked or removed; (iv) Defendant enabled session-level tracking of Website behavior; (v) Defendant disclosed location-related, product-interest, service-interest, and purchase-intent data; and (vi) Defendant deprived Plaintiff and Class Members of control over the dissemination and use of their data.

176.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members had their privacy invaded, lost control over their communications and data, lost the economic value of their data, suffered unwanted profiling and retargeting, and spent time and effort attempting to remove, disable, or limit tracking identifiers and prevent further disclosure.

177.    Plaintiff and Class Members seek appropriate relief for that injury, including restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class Members' privacy, nominal damages where available, injunctive relief, declaratory relief, and any other equitable relief that will compensate Plaintiff and Class Members and protect their privacy interests.

178.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**(Violations of the CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.*)**

179.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

180.    Violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute "unfair competition" as defined in the UCL, including, but not limited to, the following:

    a.   by violating the provisions of the CIPA prohibiting unauthorized wiretapping, Cal. Pen. Code § 631, *et. seq.*;

    b.   by violating the provisions of the ECPA prohibiting unauthorized wiretapping, 18 U.S.C 2510, *et. seq.*;

    c.   by violating the provisions of the CIPA prohibiting unauthorized trap and trace, Cal. Pen. Code § 638.51;

    d.   by violating the CDAFA, Cal. Pen. Code § 502, *et. seq.;*

181.    These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff. Defendant's acts and practices were unfair because Defendant secretly caused third-party code to execute in Plaintiff's and Class Members' browsers, intercepted and disclosed substantive Website communications, recorded or decoded addressing and signaling information, created or accessed persistent identifiers and device/browser fingerprints, wrote data to users' browsers and devices, enabled cross-site advertising and retargeting, and deprived users of a meaningful pre-collection choice. The harm to Plaintiff and Class Members outweighed any countervailing benefit and was contrary to public policies embodied in CIPA, the ECPA, CDAFA, the California Constitution, and California privacy law, as reflected by laws like the CIPA, Cal. Penal Code §§ 631 & 632, the CDAFA, Cal. Penal Code § 502, *et seq.*; the California Trap and Trace Law, Cal. Penal Code § 638.51; and the ECPA, 18 U.S.C. § 2510, *et. seq*.

182.    Defendant's acts and practices were fraudulent because Defendant's Website

32

privacy disclosures failed to clearly disclose, before the Trackers loaded and executed, that Defendant would cause third-party advertising, analytics, session-recording, customer-relationship-management, chat, tag-management, and fingerprinting code to collect, record, decode, capture, use, and disclose Plaintiff's and Class Members' Website communications, persistent identifiers, location-related data, device/browser fingerprints, and behavioral data for advertising, retargeting, analytics, profiling, conversion measurement, and revenue generation. A reasonable consumer would consider those omitted facts material when deciding whether and how to use the Website.

183.    Plaintiff relied on Defendant's omissions and the absence of meaningful pre-collection notice and choice when he used the Website. Had Plaintiff known the omitted facts before using the Website, he would not have used the Website in the same manner, would have used different privacy tools or browser settings, or would have avoided disclosing his Website communications and data.

184.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent practices, Plaintiff lost money or property, including the economic value of his personal data and Website communications, the value of his time and effort spent identifying and mitigating the tracking, and the benefit of using the Website without undisclosed third-party interception, fingerprinting, storage, and disclosure. Defendant treated Plaintiff's and Class Members' personal data and communications as commercially valuable assets, used them for profit, and unjustly retained benefits that should be restored to Plaintiff and the Class. Plaintiff seeks declaratory relief, restitution, disgorgement, injunctive relief, attorneys' fees where available, costs, and expenses

185.    Plaintiff seeks relief under the UCL, including declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

### DEMAND FOR JURY TRIAL

186.    Plaintiff and the Class hereby demand trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class,

33

FIRST AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL

and naming Plaintiff's attorneys as Class Counsel to represent the Class;

2. For an order declaring that Defendant's conduct violates the statutes referenced herein;

3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

4. For statutory damages of $5,000 for each violation of CIPA section 631 and 638.51(a);

5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;

6. For pre- and post-judgment interest on all amounts awarded;

7. For an order of restitution and all other forms of equitable monetary relief;

8. For an order providing injunctive and other equitable relief as necessary to protect the Plaintiff's interests as requested herein, including, but not limited to:

   a. Ordering that Defendants immediately cease and desist the unauthorized interception, transfer, release, sale, and disclosure of Plaintiff's data;

   b. Ordering that Defendants remove, block, disable, control, update, manage, and audit any code, software, hardware, operations, systems, policy, procedure, protocols, and processes that allow all unauthorized third parties to intercept, access, copy, collect, take, open, view, monitor, mine, analyze, store, sell, gain, exchange, or otherwise use Plaintiff's data;

   c. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner data not necessary for its provision of services.

9. For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: July 9, 2026                    **POTTER HANDY LLP**


By: /s/ James M. Treglio
    James M. Treglio, Esq.
    Mark Potter, Esq.
    Isabel Rose Masanque, Esq.
    Attorneys for Plaintiff

34